UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA          )
                                  )
          v.                      )          Case No. 2:25-cr-00143-cr-1
                                  )
THOMAS NDISSI,                    )
          Defendant.              )

**OPINION AND ORDER
DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**
(Doc. 27)

On December 4, 2025, Thomas Ndissi was charged in a one-count Indictment with knowingly attempting to persuade, induce, entice, and coerce an individual who had not attained the age of 18 years to engage in sexual activity using any facility and means of interstate and foreign commerce in violation of 18 U.S.C. § 2422(b). On April 3, 2026, Mr. Ndissi moved to suppress his statements and certain digital evidence, claiming that they had been obtained in violation of his Fifth Amendment rights. (Doc. 27.) On April 17, 2026, the government opposed the motion, (Doc. 30), and on April 24, 2026, Mr. Ndissi replied. (Doc. 32.)

Mr. Ndissi is represented by Federal Public Defender Alejandro B. Fernandez. The government is represented by Assistant United States Attorney Katherine H. Flynn.

I.       **Factual and Procedural Background.**

In the fall of 2025, Eric Clifford of the Hartford Police Department (the "HPD") operated in an undercover capacity and used a 13-year-old female persona, "Lily," who purportedly resided in Vermont. Mr. Ndissi contacted Lily in late September 2025 via a messaging app called Kik. Lily told Mr. Ndissi that she was 13 years old, and thereafter, Mr. Ndissi allegedly sent sexually explicit messages, pictures, and videos to her.

On or about October 28, 2025, Mr. Ndissi texted Lily that he had booked a room at the Super 8 Motel in Hartford, Vermont (the "Super 8 Motel"), where he allegedly planned to have intercourse with Lily. On October 31, 2025, HPD officers obtained a

search warrant, authorizing them to search Mr. Ndissi's person, the "hotel room rented by" Mr. Ndissi, and "[a]ny and all . . . types of electronic media devices," including "cell phones" and any "[p]asswords, encryption keys, and other access devices that may be necessary to access the electronic media devices[]" as well as "any and all records relating to the crime of luring child, to include but not limited to communications, photographs, films, and other visual depictions which may be stored electronically." (Doc. 30-1 at 1-2.) On November 2, 2025, Mr. Ndissi allegedly sent Lily a screenshot of the Super 8 Motel booking for the following day.

On the evening of November 3, 2025, at approximately 4:45 pm, Mr. Ndissi arrived at the Super 8 Motel where Officer Clifford and Officer Scott Moody were conducting surveillance in anticipation of his arrival. Hotel staff confirmed that Mr. Ndissi had checked in and was walking toward the rear of the motel.

As Mr. Ndissi was attempting to open his motel room door from outside on the sidewalk, Officer Moody jogged up to him and stated, "Hey, Thomas. Hartford Police, man, how are you? What's going on?" (Doc. 27-1 at 1:16-1:24.) Mr. Ndissi turned around, and Officer Clifford approached, stating, "Hey, Thomas. We're here to talk about Lily. What's . . . been going on?" and "I've been monitoring her phone calls." (Doc. 30-2 at 1:31-1:42.) Mr. Ndissi faced Officer Clifford and Officer Moody but remained silent, and Officer Clifford asked, "do you have any weapons on you?" to which Mr. Ndissi responded "no." *Id.* at 1:41-1:49. Officer Moody asked, "can you take your backpack off for me, just so I feel better?" *Id.* Mr. Ndissi did so, placing his backpack on the sidewalk.

Mr. Ndissi then walked to the other side of the motel room door and stood on the sidewalk, leaned on the exterior of the motel room's air conditioning unit, and faced Officers Clifford and Moody. Officer Clifford stood a few feet to the right of Mr. Ndissi, with one foot on the sidewalk and one foot in the adjacent parking lot, and Officer Moody stood to the left of Mr. Ndissi in the parking lot, often outside reach of Mr. Ndissi. Cars were packed in the parking lot and the sounds of passing traffic in the background can be heard on the bodycam footage. Both Officer Clifford and Officer Moody were wearing HPD uniforms, with their firearms visible and holstered.

2

Officer Clifford asked Mr. Ndissi, "do you mind talking to us about what's going on with [Lily]?" and Mr. Ndissi mumbled a response,[1] to which Officer Clifford asked, "what's that?" and Mr. Ndissi responded, "I don't know nothing, sir. I don't know nothing." *Id.* at 1:46-1:58.

Mr. Ndissi put his face in his hands, and the following conversation ensued:

Officer Clifford: What's going on? Thomas, I . . . saw the messages, okay. So, we have been monitoring it, okay. Were you just thinking with the wrong head? Like . . . what's going on?

Mr. Ndissi: Yes, sir.

Officer Clifford: So you don't have to talk to me, okay, but I want to get your side of the story, okay. Because [Lily]'s pretty freaked out right now, we have an officer with her, okay. She thinks that you got her in trouble, okay.

Mr. Ndissi: I want no trouble, sir.

Officer Clifford: Hey, you're in Vermont. We're not about jailing people and throwing the key away. It seems like you might have made a mistake. Is that right?

Mr. Ndissi: Yes.

Officer Clifford: Can you talk to me about it?

Mr. Ndissi: I didn't want to be here, sir.[2]

Officer Clifford: Talk to me about not wanting to be here and how you got

---

[1] Mr. Ndissi claims that he said "no, I don't want to talk about it[,]" (Doc. 27 at 2) (internal quotation marks omitted), whereas the government contends that Mr. Ndissi said "I don't know nothing, sir." (Doc. 30 at 4) (internal quotation marks omitted). It is unclear from the bodycam footage what Mr. Ndissi said in response to Officer Clifford's question. To the extent Mr. Ndissi claims he had invoked his right to cease all questioning, that right does not exist outside the custodial context. *See United States v. Clark*, 600 F. Supp. 3d 251, 272 (W.D.N.Y. 2022) ("*Miranda* rights cannot be asserted outside the context of custodial interrogation.") (internal quotation marks and citation omitted). During an investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), a police officer may continue to question a suspect who is not interested in talking, and a suspect may refuse to answer law enforcement's questions. *See Illinois v. Wardlow*, 528 U.S. 119, 122 (2000) ("[A]lthough police have the right to approach individuals and ask questions, the individual has no obligation to respond.").

[2] Mr. Ndissi contends that he stated, "I don't want to be here, sir[,]" (Doc. 27 at 2) (internal quotation marks omitted), and the government claims that Mr. Ndissi stated, "I don't even want to be here, sir." (Doc. 30 at 4) (internal quotation marks omitted). The bodycam footage reflects that Mr. Ndissi stated, "I didn't want to be here, sir." (Doc. 30-2 at 2:45-2:53.)

3

here.

Mr. Ndissi: I just wanted to see what's out here, but I didn't want to do it.

Officer Clifford: Then why show up if you didn't want to do it?

Mr. Ndissi: I don't want to do anything, but I just –.

Officer Clifford: You seem like a nice guy. . . . I understand you have kids. This is not the end of the world, I promise you that. I think a mistake was made on your behalf, and we . . . can work with that. This isn't the end of your life, okay.

Mr. Ndissi: I can go back to [unintelligible].

Officer Clifford: Well . . . I want to talk to you a little more, if that's okay? Are you okay talking with me?

Mr. Ndissi: Yes, sir.

*Id.* at 1:56-3:40.

Officer Clifford then asked Mr. Ndissi, "do you have any weapons on you?" and Mr. Ndissi replied, "no, sir. You can check me if you want." *Id.* at 3:38-3:42. Officer Clifford asked, "do you mind if I pat you down?" and Mr. Ndissi answered, "yes, you can" and put his arms up. (Doc. 30-2 at 3:42-3:44.) Officer Clifford briefly frisked Mr. Ndissi over his clothes and told him, "you're good, you can relax. You can lean back up against [the air conditioning unit]," and asked, "do you mind if I come over here so I can lean too?" and Mr. Ndissi replied, "yes, sir." *Id.* at 3:44-4:00. Officer Clifford thereafter leaned against the exterior wall of the motel, to the right of Mr. Ndissi who was a couple of feet away leaning on the air conditioning unit. Officer Moody remained standing a few feet away to the left of Mr. Ndissi in the parking lot. Mr. Ndissi told Officer Clifford, "I'm sorry," and Officer Clifford countered, "don't be sorry, okay" and "I want to know your side [of the story] so I can figure out the truth, okay. Talk . . . to me about Lily, how'd you meet her?" *Id.* at 4:01-4:27. Mr. Ndissi proceeded to make a number of incriminating statements as Officer Clifford continued to question him. During the discussion, Officer Clifford told Mr. Ndissi, "I appreciate you talking with me. Obviously, . . . you don't have to, but I'm just trying to get your side of the story, so I do appreciate that." *Id.* at 7:07-7:13.

At one point, Officer Clifford asked Mr. Ndissi if he had the cell phone that he

used to communicate with Lily and requested to see it. Mr. Ndissi responded in the affirmative, pulled his cell phone out of his pocket, and began unlocking it. Officer Moody approached and stood approximately one or two feet away from Mr. Ndissi. Officer Moody asked Mr. Ndissi what his cell phone password was, which Mr. Ndissi recited at least twice. Officer Moody walked away from Mr. Ndissi and stood a few feet to the left of Mr. Ndissi in the parking lot.

Officer Clifford primarily conducted the interview of Mr. Ndissi, lasting approximately twelve minutes, while Officer Moody mostly observed. Mr. Ndissi volunteered information in addition to answering questions. Officer Clifford generally asked open-ended questions and inquired whether Mr. Ndissi had any questions for him. Other than the cursory pat down, neither officer physically touched Mr. Ndissi. They also did not verbally threaten him or brandish their weapons.

At the conclusion of his questioning, Officer Clifford informed Mr. Ndissi that he would be placed under arrest "for luring a child," that he would be taken to the HPD, and that they could "talk a little more" at the station. *Id.* at 13:29-13:37. Officer Moody seized Mr. Ndissi's cell phone and handcuffed him. Officer Clifford continued to talk to Mr. Ndissi, discussing procedural and booking issues.

Approximately ninety minutes later, at the HPD, Detective Sarah Superneau confirmed Mr. Ndissi's name and date of birth and informed him of his *Miranda* rights prior to questioning him. (Doc. 30-3 at 1:36-3:01.) Mr. Ndissi indicated that he understood his *Miranda* rights and waived his rights both verbally and through the execution of a written waiver. *Id.* at 2:01-3:01; Doc. 27-3 at 1. During the interview with Detective Superneau, Mr. Ndissi made additional incriminating statements.

## II.    Conclusions of Law and Analysis.

### A.    Whether Officer Clifford's and Officer Moody's Questioning of Mr. Ndissi at the Super 8 Motel Violated His Fifth Amendment Rights.

Under the Fifth Amendment of the Constitution, "[n]o person shall . . . be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend V.

> "In light of the Fifth Amendment right against self-incrimination, law enforcement may not interrogate an individual 'taken into custody or

5

otherwise deprived of his freedom by the authorities in any significant way' without the warning 'that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'"

*United States v. Pence*, 172 F.4th 213, 217 (2d Cir. 2026) (quoting *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966)). "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning" and *Miranda* warnings are not provided, "no evidence obtained as a result of interrogation can be used against" the individual. *Miranda*, 384 U.S. at 478-79; *see also Missouri v. Seibert*, 542 U.S. 600, 608 (2004) ("[F]ailure to give the prescribed [*Miranda*] warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained.") (footnote omitted).

For *Miranda* warnings to be required, "the defendant must be subject to an interrogation, and the interrogation must have occurred while the defendant was in custody." *Pence*, 172 F.4th at 217 (citations omitted). Here, it is undisputed that Mr. Ndissi was subject to interrogation at the Super 8 Motel and that neither Officer Clifford nor Officer Moody informed Mr. Ndissi of his *Miranda* rights. The issue is whether Mr. Ndissi was in custody when he interacted them outside of his motel room. In general, "the temporary and relatively nonthreatening detention involved in a . . . *Terry* stop does not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) (internal citation omitted).

Instead, an individual is in custody for *Miranda* purposes when there is "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) (internal quotation marks and citation omitted). "'In the absence of actual arrest, an interrogation is not "custodial" unless the authorities affirmatively convey the message that the defendant is not free to leave,' or that he is 'completely at the mercy of the police.'" *United States v. Familetti*, 878 F.3d 53, 60 (2d Cir. 2017) (internal citation omitted).

Although Mr. Ndissi argues that he was in custody due to Officers Clifford and

6

Moody "[a]pproaching him in the parking lot [] for the sole purpose of arrest," (Doc. 27 at 6), "the 'subjective views harbored by either the interrogating officers or the person being questioned' are irrelevant[]" to the *Miranda* custody analysis. *J.D.B.*, 564 U.S. at 271 (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)). "[T]he inquiry into custodial status is objective[.]" *Familetti*, 878 F.3d at 60. It "'asks (1) whether a reasonable person would have thought he was free to leave the police encounter at issue and (2) whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'" *Pence*, 172 F.4th at 218 (quoting *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016)). "While the first condition—a seizure—is necessary for concluding that a suspect was in custody, 'not every seizure constitutes custody for purposes of *Miranda*.'" *United States v. Schaffer*, 851 F.3d 166, 173 (2d Cir. 2017) (quoting *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004)). "Thus, the 'ultimate inquiry' is whether a reasonable person would have understood the [officers'] restraint on his freedom to equal 'the degree associated with a formal arrest.'" *Id.* (quoting *Newton*, 369 F.3d at 670).

In determining whether a reasonable person would have felt free to leave, a court must "'examine all of the circumstances surrounding the interrogation,' including any circumstance that 'would have affected how a reasonable person' in the suspect's position 'would perceive his or her freedom to leave.'" *J.D.B.*, 564 U.S. at 270-71 (internal citations omitted). Some factors to consider are:

> (1) the interrogation's duration; (2) its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion.

*Pence*, 172 F.4th at 218 (quoting *Faux*, 828 F.3d at 135). Courts also consider the tone of the questioning, the number of officers involved, and whether the defendant was told he or she could refuse to answer questions. *See Faux*, 828 F.3d at 135; *Cruz v. Miller*, 255 F.3d 77, 85-87 (2d Cir. 2001); *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998).

7

In this case, Officer Clifford's questioning of Mr. Ndissi was relatively brief, lasting approximately twelve minutes, took place in a conversational tone, and occurred in a public location. *See United States v. Roncone*, --- F. Supp. 3d ----, 2026 WL 787554, at *8 (W.D.N.Y. Mar. 20, 2026) (finding defendant was not in custody where "the interview by [the officer] was short—a total of around 20 minutes[]"); *United States v. Carver*, 2024 WL 36988, at *9 (E.D.N.Y. Jan. 3, 2024) (finding "the length of questioning was relatively short[]" and "not so long as to indicate that [d]efendant was in custody[]" where defendant "was questioned for approximately an hour and 20 minutes").

Mr. Ndissi was not handcuffed or otherwise physically restrained. There was thus none of the hallmarks of a formal arrest. *See Cruz*, 255 F.3d at 86 (finding defendant was not in custody because "[t]he questioning occurred on a public street[]" and "[t]he suspect was not handcuffed[]"). Although Mr. Ndissi points out that Officers Clifford and Moody were wearing "'tactical vests' or tactical 'plate carriers' specialized for agility amid armed combat[]" and that "[t]he pouches they [were] wearing in front appear to be ammunition pouches where fresh and spent magazines or other gear can be quickly stowed and retrieved[,]" (Doc. 32 at 4-5), Officer Clifford and Officer Moody wore "typical patrol clothes" and neither of them brandished their weapons. (Doc. 30 at 7); *see also Roncone*, --- F. Supp. 3d ----, 2026 WL 787554, at *8 ("[W]hile both [officers] were armed, neither showed their weapons[.]").

Officers Clifford and Moody stood a few feet away from Mr. Ndissi on each side of him, did not tell him he was not free to leave, and did not block his exit. *See United States v. Beal*, 730 F. App'x 30, 33-34 (2d Cir. 2018) (finding defendant was not in custody because the officers "did not tell [defendant] that he could not leave or physically block or prevent him from leaving the room[]"); *see also United States v. Kirsh*, 54 F.3d 1062, 1068 (2d Cir. 1995) (finding defendant was not in custody when "the only restraint imposed on [her] was that she was not permitted to enter the apartment during the search"). After patting him down, Officer Clifford asked for Mr. Ndissi's permission to stand near him against the wall, which Mr. Ndissi permitted. Officers Clifford and

8

Moody told Mr. Ndissi at least twice that he did not have to talk to them and asked for Mr. Ndissi's permission to ask questions to which Mr. Ndissi agreed. Although Officer Moody requested that Mr. Ndissi take off his backpack at the outset of the questioning, this was phrased as a request, not an order.[3]

Mr. Ndissi argues that he was in custody because Officer Clifford frisked him for weapons when Officer Clifford "had no indication that Mr. Ndissi was either armed or dangerous" and "the frisk served only to convey that the police were in absolute control." (Doc. 32 at 3.) No court has apparently concluded that a brief pat down for weapons, without more, renders an interrogation custodial. *See Terry v. Ohio*, 392 U.S. 1, 26 (1968) (finding a "protective search for weapons . . . constitutes a brief . . . intrusion upon the sanctity of [a] person[]" that may be part of a lawful investigative stop); *see also United States v. Alexander*, 2018 WL 1891307, at *7 (D. Vt. Apr. 19, 2018) ("[T]he officers' brief pat-down search of [d]efendant after he exited the rental vehicle at the outset of the interview was a permissible part of an investigative stop that did not place [d]efendant in custody.") (collecting cases). A reasonable person in Mr. Ndissi's position would understand that he remained free to leave and was not under arrest.

Based on the totality of the circumstances, the court finds that Mr. Ndissi was not in custody when he was questioned by Officers Clifford and Moody at the Super 8 Motel. Officers Clifford and Moody were therefore not required to provide Mr. Ndissi with *Miranda* warnings. Mr. Ndissi's motion to suppress statements that he made at the Super

---

[3] *See United States v. Pence*, 172 F.4th 213, 218-19 (2d Cir. 2026) (finding defendant was not in custody because "[t]he agents never yelled at or threatened him[,]" he "was told that he was not under arrest and did not have to speak with the agents[,]" "[a]nd he never asked to leave or for the questioning to stop[]"); *United States v. Familetti*, 878 F.3d 53, 60 (2d Cir. 2017) (finding defendant was not in custody where "[t]he officers advised [defendant] several times that he was not under arrest and was free to leave[]" and where "[t]here is no evidence that [defendant] ever asked or tried to leave the interview[]"); *United States v. Faux*, 828 F.3d 130, 139 (2d Cir. 2016) (finding defendant was not in custody because "she was told 20 minutes into the interview that she was not under arrest; she was never told that she was not free to leave; she did not seek to end the encounter, or to leave the house, or to join her husband; the tone of the questioning was largely conversational; [and] there is no indication that the agents raised their voices, showed firearms, or made threats[]") (emphasis omitted).

9

8 Motel is DENIED.

### B.    Whether Mr. Ndissi's Statement Regarding His Cell Phone Password Was Involuntary.

Mr. Ndissi argues that he was coerced to share his cell phone password with Officers Clifford and Moody and, as a result, the contents of his cell phone must be suppressed as "[t]he physical fruit of actually coerced statements[.]" (Doc. 27 at 9) (internal quotation marks omitted). "Incriminating statements made in non-custodial settings are inadmissible if the statements were not made voluntarily[.]" *United States v. Kourani*, 6 F.4th 345, 351 (2d Cir. 2021). "To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 189 (2004) (citation omitted). A communication is testimonial if it requires the suspect to "'to disclose the contents of his own mind[.]'" *Doe v. United States*, 487 U.S. 201, 211 (1988) (quoting *Curcio v. United States*, 354 U.S. 118, 128 (1957)).

Although "[c]ourts in the Second Circuit have split on the question of when and whether cell phone credentials are testimonial statements that qualify for Fifth Amendment privilege[,]" *United States v. Gogic*, 770 F. Supp. 3d 529, 538 (E.D.N.Y. 2025) (collecting cases), most courts have found that a defendant's communication of a cell phone password constitutes a testimonial statement. *See, e.g., id.* ("[T]he revelation of a passcode from a suspect's mind or memory is testimonial in character. Unlike biometric credentials, such as facial recognition or a fingerprint, the revelation of a passcode requires the accused to reveal 'the contents of his mind.'") (citation omitted); *United States v. Shvartsman*, 722 F. Supp. 3d 276, 316 (S.D.N.Y. 2024) ("[Defendant]'s articulation of the phone passcode—like the 'vast majority of verbal statements'—was 'testimonial.'") (citation omitted).

When a *Miranda* violation is found, the remedy is the suppression of the defendant's statement, not "the physical fruits of the suspect's unwarned but voluntary statements." *United States v. Patane*, 542 U.S. 630, 634 (2004). To the extent Mr. Ndissi claims he was coerced into providing his cell phone password, a statement is compelled

10

and made involuntarily only "if the defendant's 'will was overborne.'" *Kourani*, 6 F.4th at 351 (quoting *United States v. Corbett*, 750 F.3d 245, 253 (2d Cir. 2014)). In determining whether a statement was involuntary, courts evaluate "the 'totality of the circumstances,' including '(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials.'" *Id.* at 352 (quoting *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018)).

Mr. Ndissi alleges that when Officers Clifford and Moody were in uniform, stood close to him with holstered weapons, and patted him down, they created a coercive environment which forced him to give his cell phone password against his will. He does not claim that he was particularly vulnerable to coercion, nor does he claim that Officer Clifford or Officer Moody used threats, trickery, or deceit to obtain the password from him. He was not physically restrained or threatened. The questioning proceeded in a cordial and conversational manner and was relatively brief in nature. *See Haak*, 884 F.3d at 415 (finding defendant's statement was voluntary because neither officer "display[ed] any weapons[,]" defendant "was unrestrained throughout the interview[,]" and "the interview was conducted in a 'conversational' and polite manner throughout"). Mr. Ndissi not only provided his password, he voluntarily repeated it. Against this backdrop, there is no evidence that Mr. Ndissi's will was overborne.

Moreover, as the government points out, even if Mr. Ndissi's statement regarding his cell phone password was made involuntarily, the contents of his cell phone need not be suppressed as fruit of the poisonous tree due to the inevitable discovery doctrine. "The 'inevitable discovery' rule permits unlawfully obtained evidence to be admitted at trial if the government can 'establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. Vilar*, 729 F.3d 62, 83 n.18 (2d Cir. 2013) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)).

Prior to questioning Mr. Ndissi at the Super 8 Motel, Officer Clifford obtained a search warrant, authorizing him to seize and search Mr. Ndissi's cell phone. The contents of Mr. Ndissi's cell phone therefore were likely to have been inevitably discovered. *See*

11

*United States v. Booth*, 583 F. Supp. 3d 545, 554 (S.D.N.Y. 2022) (denying defendant's motion to suppress the contents of his cell phone "because it is clear that the [g]overnment would have inevitably discovered the same information when it searched the phone a few days later pursuant to a duly obtained warrant[]"); *United States v. Felton*, 2018 WL 4462361, at *4 (S.D.N.Y. Sept. 18, 2018) (denying defendant's motion to suppress the contents of his cell phones because they "would have inevitably been discovered[]" as the officers had a valid search warrant which "included cell phones in its list of evidence to be searched[]").

For the foregoing reasons, Mr. Ndissi's motion to suppress the contents of his cell phone is DENIED.

### C.    Whether Detective Superneau's Questioning of Mr. Ndissi at the HPD Violated His Fifth Amendment Rights.

There is no dispute that Mr. Ndissi was apprised of his *Miranda* rights prior to Detective Superneau's interrogation of him at the HPD and that Mr. Ndissi waived those rights verbally and in writing. Relying on *Missouri v. Seibert*, Mr. Ndissi nonetheless argues that Detective Superneau's interrogation of him violated his Fifth Amendment rights because he should have received his *Miranda* warnings prior to being questioned at the Super 8 Motel. He therefore claims that "the officers intentionally applied a two-step interrogation process to avoid the inoculating effect of the *Miranda* warnings, [and] his station-house confession must also be suppressed." (Doc. 27 at 5.)

In *Seibert*, the defendant was suspected of arson and subjected to custodial interrogation for thirty to forty minutes, during which she made incriminating statements without being informed of her *Miranda* rights. Thereafter, "she was given a [twenty]-minute coffee and cigarette break[,]" and then subjected to a second custodial interrogation where, after *Miranda* warnings, she was "confronted . . . with her pre[-]warning statements[.]" *Seibert*, 542 U.S. at 605. The majority of the Supreme Court found that this two-step process violated *Miranda* and the Fifth Amendment, although it was divided regarding the applicable test for this detention. In the Second Circuit, "Justice Kennedy's concurrence in *Seibert* is controlling." *United States v. Moore*, 670

F.3d 222, 229 (2d Cir. 2012) (citing *United States v. Capers*, 627 F.3d 470, 476 (2d Cir. 2010)). Justice Kennedy found that the officer "used a two-step questioning technique based on a deliberate violation of *Miranda*[]" and that, "[w]hen an interrogator uses this deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, post[-]warning statements that are related to the substance of pre[-]warning statements must be excluded absent specific, curative steps." *Seibert*, 542 U.S. at 620-21 (Kennedy, J., concurring).

The Second Circuit has articulated the two-step *Seibert* test as follows:

> First, was the initial statement, though voluntary, obtained in violation of the defendant's *Miranda* rights? *If not, there is no need to go further*. If the initial statement was obtained in violation of the defendant's *Miranda* rights, has the government demonstrated by a preponderance of the evidence, and in light of the totality of the objective and subjective evidence, that it did not engage in a deliberate two-step process calculated to undermine the defendant's *Miranda* rights? If so, the defendant's post-warning statement is admissible so long as it, too, was voluntary; if not, the post-warning statement must be suppressed unless curative measures (designed to ensure that a reasonable person in the defendant's position would understand the import and effect of the *Miranda* warnings and waiver) were taken before the defendant's post-warning statement.

*Moore*, 670 F.3d at 229-30 (emphasis omitted and emphasis supplied) (internal citation omitted).

Because Officers Clifford and Moody were not required to inform Mr. Ndissi of his *Miranda* rights prior to questioning him at the Super 8 Motel, "there is no need to go further." *Id.* at 229. *Seibert*'s prohibition of a two-step process thus does not apply to Mr. Ndissi's post-warning statements made at the HPD. *See United States v. Medina*, 19 F. Supp. 3d 518, 542 (S.D.N.Y. 2014) (finding defendant's post-warning statements were not "obtained as the result of a deliberate two-stage interrogation in violation of" *Seibert* because defendant "was not 'in custody'" during the first interrogation and "*Miranda* warnings were therefore not required").[4] Accordingly, Mr. Ndissi's motion to suppress

---

[4] *See also United States v. Kiam*, 432 F.3d 524, 531 (3d Cir. 2006) (finding that, because officers were not required to provide defendant *Miranda* warnings during the initial interrogation, *Seibert* did not apply and defendant's post-warning statement was admissible); *United States v.*

13

statements that he made during his interrogation at the HPD is DENIED.

## CONCLUSION

For the foregoing reasons, the court DENIES Mr. Ndissi's motion to suppress his statements and certain digital evidence. (Doc. 27.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 7th day of May, 2026.

Christina Reiss, Chief Judge
United States District Court

---

*Courtney*, 463 F.3d 333, 337 (5th Cir. 2006) (finding that, "because the first two statements were not obtained in violation of *Miranda*, the district court erred in applying *Seibert*[]" to defendant's post-warning statements); *Johnson v. Warren*, 2020 WL 8254336, at *3 (6th Cir. Sept. 1, 2020) (affirming the district court's conclusion that "*Seibert* did not apply to the circumstances of [defendant]'s case" because the defendant in *Seibert* "was in custody both pre- and post-*Miranda* interrogation, whereas [defendant here] was not in custody when he provided his pre-*Miranda* statements[]"); *Smith v. Clark*, 612 F. App'x 418, 421 (9th Cir. 2015) ("*Seibert* does not apply where, as here, the suspect was not in custody during the first stage of the interrogation.") (citation omitted); *Rainey v. Robinson*, 2025 WL 381576, at *6 (D.N.J. Feb. 3, 2025) (finding that *Seibert* did not apply because "[p]etitioner was not in custody initially; *Seibert* concerned custodial interrogations[]").